**WILDERNESS WATCH, a non-profit corporation under the laws of Montana; William Worf, an individual; and Five Valleys Audubon, Inc., a non-profit corporation under the laws of Montana, Plaintiffs,**

v.

**UNITED STATES FOREST SERVICE, an agency of the United States Department of Agriculture; Bertha Gillam, Forest Supervisor of the Bitterroot National Forest; John Mumma, Regional Forester, Northern Region; John Burns, Forest Supervisor of the Salmon National Forest; and Gray Reynolds, Regional Forester, Intermountain Region, Defendants.**

**No. CV 91–103–M–SRT.**

United States District Court,
D. Montana,
Missoula Division.

Sept. 19, 2000.

Jack R. Tuholske, Missoula, MT, for Wilderness Watch, William Worf.

Lorraine D. Gallinger, Office of the U.S. Attorney, Billings, MT, for USFS, Bertha Gillam, John W. Mumma, John Burns, Gray Reynolds.

## MEMORANDUM AND ORDER

SIDNEY R. THOMAS, Circuit Judge.

Distilled to its essence, this case concerns whether the United States Forest Service ("USFS") violated federal environmental law by allowing the construction of several permanent hunting and fishing lodges along the banks of the Salmon River after passage of the Central Idaho Wilderness Act.

Wilderness Watch, William Worf, and Five Valleys Audubon, Inc. (collectively, "Wilderness Watch") first filed a complaint challenging some of the USFS actions in 1991. Following the filing of cross-motions for summary judgment in 1992 and 1993, the USFS agreed to prepare an Environmental Impact Statement. Pursuant to the parties' stipulation, Judge Lovell stayed the action pending completion of the EIS. The final EIS ("FEIS") was is-

sued in May 1995, and this litigation resumed.

In early 1996, Wilderness Watch filed a first amended complaint alleging violations of the Wild and Scenic Rivers Act, 16 U.S.C. § 1271 *et seq.*, the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*, the National Historic Preservation Act, ("NHPA"), 16 U.S.C. §§ 470–470w, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Specifically, the complaint challenged both the issuance by the USFS of several "special-use" permits to hunting outfitters that have constructed permanent structures along portions of the Salmon River in Idaho designated as "wild" under the WSRA and the adequacy of the FEIS prepared by the USFS prior to the issuance of the special-use permits. Subsequently, Wilderness Watch voluntarily dismissed its NHPA claim.

The parties filed cross-motions for summary judgment in 1996. The case unfortunately lay dormant until July 17, 2000, when it was reassigned by Chief Judge Shanstrom to this court (sitting by designation pursuant to 28 U.S.C. § 291(b)) following the assumption of senior status by Judge Lovell. At request of the court, the parties filed supplemental briefs on August 11, 2000. Oral argument on the cross-motions for summary judgment was held on August 31, 2000, at which the court invited informal supplemental letter briefs to be filed no later than September 7, 2000.

The court has jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701–706. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1). Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

## FACTUAL AND PROCEDURAL HISTORY

### A. The Salmon River: Legal Framework and Regulatory History

In 1931, to maintain the area surrounding the Middle Fork of the Salmon River "in its present undeveloped condition," the USFS designated slightly over one million acres as the "Idaho Primitive Area." (AR 1935; Appendix).[1] The object of the designation was "[t]o maintain in primitive condition ... National Forest land in central Idaho by closing the area to construction of public roads, buildings and other permanent improvements, and to occupancy under Special Use permit." (AR 1935; Appendix). With some later additions, the area of concern to us became jointly managed as part of the Idaho and Salmon River Breaks Primitive Areas.

The regulations applicable to the Idaho and Salmon River Breaks Primitive Areas provided that "there shall be no roads or other provision for motorized transportation, no commercial timber cutting and no occupancy under special use permits for hotels, stores, resorts, summer homes, organizational camps, hunting and fishing lodges or similar uses." 36 C.F.R. § 293.17 (1999).

During the 1960's, Congress turned its attention to protection of primitive areas and wild rivers. Relevant to our inquiry, in 1968 Congress enacted the Wild and Scenic Rivers Act ("WSRA" or "Act"), Pub.L. No. 90–542, 82 Stat. 906 (1968) (codified at 16 U.S.C. §§ 1271 *et seq.*), as

1. "AR" refers to the administrative record; "CR" refers to the court's docket number; "Pl.Stmt." refers to the plaintiff's statement of uncontroverted facts, CR 57; "Def.Stmt." refers to the defendant's statement of uncontro-verted facts, appended as part of the defendant's cross-motion for summary judgment and opposition; and "Jt.Stmt." refers to the joint statement of undisputed facts.

amended by the Central Idaho Wilderness Act ("CIWA"), Pub.L. No. 96–312, 94 Stat. 948 (1980), to "protect[ ] for the benefit and enjoyment of present and future generations" and "preserve[ ] in free-flowing condition" certain designated rivers and river areas that possess "outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values." *See* 16 U.S.C. § 1271. The WSRA allows for the classification of river areas into one of three designations depending on the degree of protection they are to receive: wild, scenic, and recreational. *See id.* § 1273(b). Rivers designated to be wild, scenic, or recreational must "possess[ ] one or more of the values" referred to in § 1271. *Id.* In addition, the WSRA requires designated rivers to be administered in such a manner as to protect and enhance the values which caused the river to be included in the WRSA system. *See* 16 U.S.C. § 1281(a); *see also Hells Canyon Alliance v. U.S.F.S.,* 227 F.3d 1170, 1177–1178 (9th Cir.2000); *Sokol v. Kennedy,* 210 F.3d 876, 878 (8th Cir. 2000).

A "wild river area" is the most restrictive designation and is defined to be a river "or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds and shorelines *essentially primitive* and waters unpolluted." 16 U.S.C. § 1273(b)(1) (emphasis added). Rivers designated to be wild "represent vestiges of primitive America." *Id.* In contrast, river areas designated to be "scenic" or "recreational" receive much less protection. For example, "scenic river areas" should be "free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads." *Id.* § 1273(b)(2). "Recreational river areas," in accordance with the emphasis on recreation, receive the least protection: these are river areas "that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past." *Id.* § 1273(b)(3).

Section 4 of the WSRA, 16 U.S.C. § 1275, requires the Secretary of the Agriculture to prepare a report on the suitability of rivers designated by Congress under the Act to be "potential additions" to the wild and scenic rivers system. As previously noted, prior to the enactment of the WSRA, the USFS managed the Salmon River corridor at issue here as part of the Idaho and Salmon River Breaks Primitive Areas. Jt.Stmt. ¶ 17. Upon WSRA's passage and in keeping with § 1275, the USFS completed a report recommending that 237 miles of the Salmon River, including the portions at issue here, should be added to the wild and scenic river system. Def.Stmt. ¶ 8.

In 1977, the USFS adopted a Salmon River Management Plan ("Management Plan") pursuant to § 12 of the WSRA, 16 U.S.C. § 1283, to provide for interim protection for the Salmon River prior to its designation as a wild and scenic river.[2] Def.Stmt. ¶ 9; (AR 1967–2062). The Management Plan provided that "[e]xisting outfitter camps may be continued in their present location until classification occurs, provided they are kept neat and do not cause resource problems." Def.Stmt. ¶ 10; (AR 2013).

---

2. 16 U.S.C. § 1283(a) requires the Secretary of Agriculture to take "such action respecting management policies, regulations, contracts, plans, affecting such lands ... as may be necessary to protect such rivers in accordance" with the purposes of the Act for those rivers included within the Wild and Scenic Rivers System or those under consideration for such inclusion. *See Wilderness Society v. Tyrrel,* 918 F.2d 813, 816–17 (9th Cir.1990).

The Frank Church- River of No
Return Wilderness

In 1980, Congress passed CIWA, which established the "Frank Church—River of No Return Wilderness" area. The newly created wilderness area, often colloquially referred to as "the Frank," included the former Idaho Primitive Area, the former Salmon River Breaks primitive area, and a number of other areas which had been under study. At almost 2.5 million acres, the Frank is the largest wilderness in the conterminous statues and National Forest System. (FEIS; Appendix C). It is slightly larger than the combined states of Rhode Island and Delaware. At the time of its creation, the Frank was located on twelve different Ranger Districts within six separate National Forests (Bitterroot, Boise, Challis, Nez Perce, Payette and Salmon) and two different National Forest Regions (I and IV). This administrative farrago was later lead to some of problems that occasioned this suit.

The CIWA also classified portions of the Salmon River at issue here as "wild" and adjacent portions of the Salmon River as "recreational" and charged the Secretary of Agriculture with the responsibility of managing the Salmon River. *See* CIWA § 9(b); 16 U.S.C. § 1274(a)(24); Pl.Stmt. ¶ 7. In enacting the CIWA, Congress determined that the statutory protection accorded to the Salmon River "can be provided without conflicting with established uses." CIWA § 2(a)(3). Moreover, Congress expressly recognized that "[t]he use of motorboats (including motorized jet-boats) within [the designated] segment of the Salmon River shall be permitted to continue at a level not less than the level of use" during 1978. *Id.* § 9(a). Under the WSRA, once a river area is included by Congress in the WSRA system, "area boundaries are automatically established, on a provisional basis, one-quarter mile from the river's banks." *Sokol v. Kennedy*, 210 F.3d 876, 879 n. 6 (8th Cir.2000) (citing 16 U.S.C. § 1275(d)).

The CIWA designated the 79 mile stretch of river from Corn Creek to Long Tom—the river corridor at issue in this case—as "wild." *See id.;* (AR 2012). The CIWA directed that this segment be "managed under the provisions of the [WSRA] ... and the regulations promulgated pursuant thereto." *Id.* § 9(b). The structures at issue in this suit are located in the Bitterroot National Forest portion of the river area, within the WSRA one-quarter mile area boundary.

The WSRA mandates several requirements in the administration of rivers designated to be wild, scenic or recreational. The USFS is required to review "all boundaries, classifications, and plans" to ensure their conformity with the requirements of "this subsection," meaning subsection (d) of § 1274, through regular agency processes. 16 U.S.C. § 1274(d)(2); *see Sierra Club v. Babbitt,* 69 F.Supp.2d 1202, 1249–50 (E.D.Cal.1999). Section 1274(d)(1) requires the preparation of a "comprehensive management plan" for rivers designated on or after January 1, 1986, "to provide for the protection of river values," including "resource protection, development of lands and facilities, user capacities, and other management practices necessary or desirable to achieve the purposes of [the Act]." 16 U.S.C. § 1274(d)(1).

Section 1281(a) sets forth the management duties of the federal agency charged with managing the designated river:

Each component of the national wild and scenic rivers system shall be administered in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values. In such administration primary emphasis shall be given to protecting its esthetic, scenic, historic, archeologic, and scientific features. Management plans for any such component may establish varying degrees of intensity for its protection and development, based on the special attributes of the area.

16 U.S.C. § 1281(a). Moreover, those portions of a designated river falling within areas within the national wilderness preservation system designated by the Wilderness Act, 16 U.S.C.A. § 1131 *et seq.*, are subject the Wilderness Act's requirements as well. *See* 16 U.S.C. § 1281(b). Where management of a river is covered by both the Wilderness Act and the WSRA, it is USFS policy to apply the more restrictive provisions of the two acts. (AR 1091). In addition, the "Secretary of Agriculture, in his administration of any component of the national wild and scenic rivers system area, may utilize the general statutory authorities relating to the national forests in such manner as he deems appropriate to carry out the purposes [the Act]." *Id.* § 1281(d); *see Tyrrel,* 918 F.2d at 817–18 (addressing whether the USFS has duty to prepare management plan for rivers designated under the WSRA).

Under this authority, in 1982, the USFS completed and adopted the Salmon Wild and Scenic River Management Plan ("Wild River Plan") to administer the wild river portion of the Salmon River. (AR 2260). The Wild River Plan was incorporated into the Salmon National Forest Plan. (AR 4486; FEIS at I,3). The Wild River Plan contains several provisions that apply to all outfitter camps along the Salmon River, including provisions that "[n]o new structures will be permitted except for safety and sanitation," that no additional outfitter "base camps" be permitted, and that outfitters obtain authorization before constructing permanent or semi-permanent structures. Jt.Stmt. ¶ 16.

**B.  *The Lodges***

This action concerns the presence of permanent structures and improvements in three hunting lodges along a stretch of the Salmon River designated in 1980 as a "wild" river under the WSRA and CIWA. The three lodges at issue are referred to as the Smith Gulch lodge (or "Guth Lodge"), the Arctic Creek lodge, and the Stub Creek lodge. FEIS, I, 5–8.

**1.  *The Guth Lodge***

The Guth Lodge is the subject of the most controversy in this case. Consequently, its history deserves some detailed attention. Don Smith initially constructed a hunting camp at Big Squaw Creek as a prospecting base, supplemented by subsistence hunting. This operation evolved into an outfitting and guide service. Being knowledgeable about the area, Smith became an early developer when motorboat, and later jetboat, technology made travel up the Salmon possible. Smith sold the outfitting business at Big Squaw Creek Camp to Bill Guth & Sons in 1968. Smith retained his jetboat business and later established the camp at Arctic Creek for that purpose.

The authorized use under the pre–1980 permits is important because it creates the backdrop of permissible uses that existed when CIWA was passed in 1980. Beginning in 1968, Bill Guth & Sons operated under an Outfitter–Guide Permit that designated the location of a camp as in the "Middle Fork of the Salmon River" with no improvements. Under the applicable regulations, Outfitter–Guide permittees are not allowed to construct permanent structures. The permit itself required any development plans to receive prior written approval of the Forest Supervisor. (AR 1612 ¶ 2). The prior Smith Special Use Permit which specifically referenced the Big Squaw Creek Camp was also transferred to Bill Guth & Sons in 1968 and extended for five years. (AR 1627).

On September 14, 1971, Acting District Ranger Donald Lyon wrote Bill Guth a letter accompanying transmittal of the Outfitter–Guide Permit, describing the permissible type of camps in the areas:

As you will note on your permit, some of the names describing the types of camps were changed this year. A description of the types of camps and the requirements governing the use of these camps are as follows:

*End–of–Road camp*—These camps are located near roads and road and trail junctions and are accessible by motorized vehicles. It may be posted for the exclusive occupancy of the permittee. The site may provide for parking space, toilet, corral, hitchrack and tent space.

*Base camp*—These are main camps located on sites approved in advance by the Forest Service. Sites are reserved, posted and regularly used during the permitted season by the permittee. Improvements shall be rustic and limited to necessary facilities for the safe and sanitary conduct of the operation.

*Spike camp*—Used on a temporary basis in connection with an outfitter's permitted operations. They are not reserved but are on a first-come, first-serve basis for the outfitter or private hunters.

*Drop camp*—Used by an individual or group where all or part of the supplies and equipment are transported by an outfitter for a fee. The outfitter may or may note furnish the supplies and equipment used by the party. The sites are not reserved for exclusive occupancy and are generally at a location of the user's choice.

(AR 1234).

Lyon followed up this letter with one dated October 14, 1971 reminding Guth that "all man-made material resulting from any use, outfitter or private party, at permitted campsites will be packed out by the end of the permitted season." The letter emphasized the permit's requirement that "all camps except End–of–Road camps must have temporary improvements removed at the end of the season." (AR 1238).

In 1973, when the Special Use Permit expired, the Big Squaw Creek Camp was integrated into a one-year Outfitter–Guide Permit, now held by Guth Enterprises, Inc., a successor company. (AR 1648). The improvements on the permit for the Big Squaw Creek Camp are listed as "temporary—stock handling and sanitation." The permit continued to contain an anti-development clause, requiring that all improvements be approved in advance. (AR 1649 ¶ 2). It also contained a provision noting that all camps were subject to Primitive Area restrictions. (AR 1652 ¶ 38). The 1974 Outfitter–Guide Permit listed Big Squaw Creek as having "temporary facilities," (AR 1655) as did the 1975 Permit, (AR 1664). The 1976 permit listed "frame buildings" as the described improvements at Big Squaw Creek. (AR 1673). The 1977 permit described the improvements as "temporary facilities only." (AR 1682). The 1978 permit described the improvement as "frame buildings," (AR 1697), as did the 1979 permit, (AR 1702). The 1980 permit did not describe any improvements at Big Squaw Creek. (AR 1708). All of the permits contained the standard pre-printed anti-development clause, (AR 1656, 1665, 1674, 1683, 1698, 1703, 1709), along with other specific restrictions.

After the designation of the Salmon River as a wild river in 1980, the USFS issued a five-year permit to Guth for Big Squaw camp, and later in 1985, a one-year outfitter-guide permit for Big Squaw camp. (AR 1738).

The camp at Big Squaw Creek was apparently a makeshift, ramshackle affair. Initially, it consisted of little more than "an old metal barge perched on the site, with wood frame add-on buildings." (AR 1439). Forest Supervisor Richard Hauff noted in

1988 that the camp had been "constructed years ago, strictly as a back country hunting and fishing camp ... without consideration for aesthetic beauty." (AR 95). Others were not as charitable. One citizen commented:

> That the Big Squaw Camp was an eyesore is beyond question. It looked as though it had been slapped together by Ma and Pa Kettle on a bad day. That it stood for so many years suggests that architects do not run the Salmon; for surely, no self-respecting member of that profession would have passed the camp without stopping to raze those sorry shacks.

(AR 29–30).

Discussion about moving the Big Squaw Creek to the location at Smith Gulch began in the late sixties.

On March 11, 1968, for example, District Ranger Robert Shackelford wrote a memo stating:

> I propose that I contact Bill Guth, Sr.... and make a plan on the ground with Guth for a Special Use (tent camp) at Smith Bar. If Guth agrees to a permit conforming to our regulations and plan, then we should give Guth a permit for Smith Bar and do away with the permit

he now has near the mouth of Big Squaw Creek.

(AR 1178).

On April 9, 1969, Ranger Shackelford informed Guth that sufficient money had been allocated to construct a trail between the Big Squaw Creek Camp and Smith Gulch "so that you can move to Smith Gulch." (AR 1189).

In late 1971, after Acting District Ranger Lyon had reminded Guth about the temporary nature of the camps, discussions continued. Handwritten notes of one of those meetings noted that the parties "need something @ Smith Gulch which better fits the situation;" that "would *like* to have him *move* by this fall or at least fall '73" and that the parties would "work toward a *completely* portable camp!!" (AR 1240) (emphases in original). The notes also indicate that Guth would "try not to use a cabin—replace w/portable." (AR 1240).

After an inspection in 1972, Forestry Technician Dale Hoth recommended that the Big Squaw Creek camp be "less permanent;" that "all equipment be packed out;" and that the camp "be moved out of sight of river traffic." (AR 1253).

In March 1972, Lyon met with Guth. He noted that the Guths "plan to move the camp to their mining claim location at the mouth of Smith Gulch." (AR 1249). At that time, "[a]ll improvements at the Big Squaw site will be removed." (AR 1249). The agreed plan for the improvements at the Smith Gulch site was that "[t]he bunkhouses and the cookshed will be constructed in a manner which makes them completely portable." (AR 1249). The Smith

Gulch site was to be constructed in Spring 1972. (AR 1250).

For reasons not apparent in the record, the move was not accomplished. In early September 1972, another USFS official handwrote Hoth that Guth should be notified in writing that the Big Squaw Creek camp would not fit into the management on the river and that it must be moved. (AR 1255).

In May, 1973, Ranger Lyon met with Guth, who "agreed to move camp, *if* we will state what they can construct @ Smith Gulch." (AR 1261). Lyon noted that "[t]he only thing we can approve is 'completely temporary.'" (AR 1261). Sometime later in 1973, a decision was apparently made to defer ordering removal of the structures at Big Squaw Creek pending permanent classification of the Salmon River Breaks Primitive Area. (AR 1268). This decision was memorialized again in April, 1977, when District Ranger Frank Elder wrote Norm Guth that "[o]nce classification decisions have been made and river camp standards decided, we will probably want to move the camp to the mouth of Smith Gulch and build new facilities at that location." (AR 1303). Acting District Ranger Bert Strom reaffirmed that position in a letter dated June 21, 1978. (AR 1313–1314).

After passage of the CIWA in 1980 and completion of the Wild River Plan in 1982, the USFS reinitiated its efforts to move the Guth camp to Smith Gulch and began an environmental assessment of the proposed relocation. (AR 1363–66). Two critical hindrances to the relocation were identified: the Smith Gulch site was included as part of an unpatented mining claim, and evidence of prehistoric activity was discovered near the site. Def.Stmt. ¶ 16. Both of these impediments were resolved in 1987.[3]

---

**3.** As part of this process, the USFS also prepared pursuant to CIWA § 8(b) an inventory of the cultural and historic resources in the Salmon River corridor. In preparing the inventory the USFS consulted with the Idaho State Historic Preservation Officer. (AR 194, 5951–5958). The Johnny Briggs cabin located in Smith Gulch was identified as an historically significant site and suitable for inclusion in the National Register of Historic

On March 29, 1988, the USFS completed an environmental assessment for the relocation of the Guth camp and issued a Decision Notice approving the Smith Gulch camp. Def.Stmt ¶ 18; Pl.Stmt. ¶ 20.

It was then that a series of critical administrative missteps occurred. First, although public comment had originally been solicited in 1983 in connection with the move, no public comment was solicited on the actual plans. Second, no analysis was performed as to whether the proposed structure was permitted under the CIWA and WSRA. Third, the construction was allowed to proceed without a permit—and without a completed and filed environmental assessment. This occurred, in part, because of internal jurisdictional and policy disagreements.

The chronology was described in a fairly candid letter from Forest Supervisor Richard Hauff in response to a concerned citizen:

> It was in 1988 when restarting the analysis process that we really dropped the ball. Our process managers simply forgot that in 1983 we advised everyone that we would have another round of public comment when we could describe the Smith Gulch site plan proposal in more detail. Had we followed the process as originally designed we might well have surfaced the current controversy prior to a decision. At any rate we went ahead and completed the analysis and Decision Notice in March of 1988. We then dropped the process ball a second time when in late March I sent a Decision Notice to the Bitterroot for the Supervisor's signature. Along about mid-April we checked on the status of

> the documents and got the idea that the approved package was on its way back. Based on the mistaken impression that "the check was in the mail" our North Fork Ranger authorized Mr. Guth to proceed with the project. Mr. Guth had prefabricated all of the new buildings so it did not take long for the structures to go up after approval. Well into the project and during the first week in May, it became clear that Bitterroot Forest and Region 1 Regional Office staff were not previously familiar with the project and were still reviewing the proposal. At this point we had a project that was 75 percent complete but with no public notice of our decision. Faced with this situation I resigned the Decision Notice on May 9, 1988, and issued public notice via new releases and letters to those who had previously corresponded with us on the project. Letters were also sent to a mailing list of potentially interested individuals and groups provided by Bitterroot National Forest staff.

> Blundering into a mess like this one is thankfully not "normal." I have never seen one like it and I'm sure all involved in this one are going to do all they can to make sure it doesn't happen again.

(AR 16).

In short, although the Salmon River Forest Supervisor signed the Decision Notice; the Forest Supervisor for Bitterroot National Forest did not give his concurrence to the Decision Notice, and no official Decision Notice issued.

If the character of the Smith Gulch project had not changed, these aberrations

Places. (AR 196–203, 5930, 5950); Def.Stmt. ¶¶ 35–36. The State Historic Preservation Office subsequently concurred with the USFS's assessment that construction of the Smith Gulch camp would have no adverse effect on the site. (AR 1361, 3258). The Johnny

Briggs cabin was entered into the National Register of Historic Places on April 10, 1992. (AR 3252–57). Wilderness Watch originally asserted an NHPA claim, but later voluntarily dismissed the claim.

would be of little consequence. However, it had—and radically so. Rather than calling for the construction of temporary facilities, the new design contemplated a complex of structures fitting the USFS description of a resort. As a USFS official described it:

> The relocated Guth Camp at Smith Gulch is planned to include new construction of four permanent cabins, a permanent 24-bed guest lodge, storage buildings, water supply and sanitary systems, and boat landing needs.
>
> Facilities of this magnitude exceed the scope of an outfitter camp and clearly place the proposed action within the "resort" category to be administered under Forest Service resort guidelines and policy.

(AR 1440).

Although somewhat soft-pedaled in Supervisor Hauff's public letter, there were serious disagreements between the Bitterroot and Salmon River forest staffs about the proposed move. The ostensible reason that the environmental assessment and Decision Notice was submitted to the Bitterroot Forest Supervisor was that concurrent jurisdiction existed over the move. The delay in obtaining approval from the Bitterroot Forest Supervisor was not bureaucratic procrastination: the Bitterroot forest staff had extremely serious concerns about the scope and design of the proposed project.

In an internal memo, James Schoenbaum, a USFS Regional Land Use Specialist identified numerous problems with the proposal, such as:

- "The proposal involves a *permanent* facility, and substantial improvements and investment, and indicates a land allocation, yet there is no evidence of consideration of need, public service, and of consistency with overall management direction."

- "The FONSI is wrong in its conclusion that there are no irreversible resource commitments. Once established, the permanent facility contemplated can only result in a permanent, highly valuable commercial site, as a practical political reality."

- "The EA does not discuss a full range of alternatives, including removal of the existing, quasi-permanent camp which is apparently unacceptable, consideration of other developable sites at a greater distance, or development on non-Federal land. Non-outfitted public accommodation needs are not addressed."

- "The proposal for 'four cabins, a 24-person lodge, storage, waste disposal, water supply, and boat landing needs' *clearly* places this proposal in the resort category of use. Resort planning and decision guidelines are in FSM 2341.1, Planning for New Sites and Areas, which includes this proposal. Policy on resorts (concession sites) is in FSM 2343.03. These procedures have not been followed."

- "The EA and FONSI do not fully evaluate the proposal nor follow National policy and guidelines. My impression is that the proposed camp relocation is an effort to authorize a new resort under an outfitter-guide permit, without fully addressing National policy, direction, and proper special-use management procedures. This is unacceptable."

- "Many outfitters and others have a strong desire to establish permanent facilities on National Forest System (NFS) lands for commercial purposes. Alternatively, many semi-permanent commercial facilities have been removed from NFS lands, some under duress. The proposal has precedent-setting opportunities to renew old is-

sues and impede progress in obtaining removal in current cases."

- "It is difficult, if not impossible, to equate this situation with the effort and dollars the Forest Service has expended elsewhere to acquire scenic easements or similar interests in non-Federal land to prevent this very type of use from becoming established to the detriment of the classified area."

(AR 1163–1164).

The senior staff of the Bitterroot Forest met to discuss the proposal and quickly came to the conclusion that it should not proceed. Among other problems, a memo generated from the meeting, and directed to the Regional Forester of Region 4, identified the following:

- "The EA does not include any primary alternatives except to leave the camp as is or move it. The decision to move it and to allow the permittee to build a 24–guest resort with four cabins, sewer and water systems, boat mooring facilities and other support improvements, appears to be in conflict with the River Plan which states that no new facilities will be constructed except for safety and sanitation."
- "The facility is a resort and does not fall under an outfitter and guide operation. It should be permitted under a term permit if it is deemed to be appropriate at all. As a resort, it should be addressed, analyzed, and decisions reached under procedures and policy applicable to resorts."
- "The desirability of such a resort on the river should be examined more closely than was done in the EA. We realize that some more substantive facilities *may* be permitted than in the wilderness, but is there a need, and are they appropriate? Both Regions have been very concerned about the planned proliferation of similar facilities on private land along this Wild

River corridor. Should we propose to permit the same thing on public lands?"

- "We understand that construction has begun on this facility. There does not appear to be any permit existing in this situation that would allow any construction to begin. No permanent facilities can be constructed under provisions of an outfitter permit. The decision has not been made public and the appeal period has not started. We may not be on very sound ground to allow construction to continue when the public has not had a chance to comment on the decision."
- "We have researched legislation and the history of this wilderness and river and find no mandate or guidance that would move us in the direction we are now proceeding. On the contrary, our thrust is to minimize permanent structures of this kind and allow the outfitter to use only those facilities that are needed for the purposes of the outfitted recreationalist. Could you give us the references that helped guide the outcome of this EA?"

(AR 1161–1162).

Until the identified concerns were addressed, the Bitterroot Forest Supervisor refused to sign the environmental assessment and Notice of Decision. When that refusal became apparent, the Salmon River Forest Supervisor decided to issue it on his own authority under the management agreement between the forest regions—and did so without addressing the concerns raised by the Bitterroot Forest Supervisor. Whether that was permissible or not is unclear from the record, but is not contested in this case. It became evident that Guth had been given verbal approval to proceed with the project by Salmon National Forest personnel before the environmental assessment had been issued. (AR

1090). By the time the Salmon National Forest Supervisor re-signed the environmental assessment, issued it under his own authority, and notified the public of the decision, construction of the Smith Gulch camp was already between 75% and 85% complete. (AR 110, 1090, 1442). According to the Decision Notice, the permit issued based on aesthetic considerations and the need to free the Big Squaw Creek site for use by overnight campers. Def.Stmt. ¶ 19; (AR 110).

Because of the inter-agency controversy, Regional Forester John Mumma requested an internal investigation into the incident. (AR 1439). It exposed some strained relations between the Regions. A summary of an interview with Bitterroot Forest Supervisor Morgan revealed as much:

> Supervisor Morgan says he became aware of the impending relocation of the camp this winter upon receiving a copy of Supervisor Hauff's first EA on March 31, 1988. He discussed the situation with Hauff and advised him to hold off moving ahead on it in view of the Forest Plan work on-going on the Bitterroot.... Morgan relates that he feels he was lied to by the Salmon, in that he understood proceedings were being held up according to his wishes, and the Salmon indicated they had no information on the current status of any on-site work by Guth when in fact he knows that Salmon National Forest personnel visited the site with a day of saying that to him. Supervisor Morgan has declined to sign and approve either EA

submitted by the Salmon National Forest....

(AR 1441).

The internal investigation concluded, among other matters, that there was "no indication that some management and coordination requirements established for the Salmon Wild and Scenic River by the 1982 Management Plan have been followed." (AR 1443). The report also concluded that "[t]he decision to relocate the camp and establish a resort under an outfitter/guide permit approach is not within National policy." (AR 1444).

Wilderness Watch appealed the Salmon River Forest Supervisor's Decision Notice within the USFS appeal process. On November 14, 1988, Regional Forester J.S. Tixier denied the appeal. Wilderness Watch appealed this decision to the Chief of the Forest Service. On September 26, 1989, the appeal was denied by a USFS Reviewing Officer Larry Henson acting on behalf of the Chief. (AR 1089).

Upon its denial of Wilderness Watch's administrative appeal, the USFS issued a permit on February 6, 1990, allowing Guth to relocate his camp to Smith Gulch. (AR 1746). With USFS permission, Guth had already commenced commercial operations. He advertised his business by stating that:

> Our new Lodge and Cabins provide modern, clean accommodations for up to 24 guests. We are small enough to be cozy for family groups as well as minibusiness meetings.

(AR 1242).

SMITH GULCH CAMP, RIVER MILE 65

It is virtually undisputed that the Smith Gulch complex is just as described. It is a modern facility consisting of six buildings, totaling 3,510 square feet. It consists of a lodge with dining facilities, a bar, and wrap around deck. The buildings have insulated wood siding and glass windows, sitting on permanent concrete foundations. A road was constructed from the river's edge to the lodge. The resort has running water, hot showers, and flush toilets. It is serviced by an underground septic system with 1500 gallon holding tanks.

The Guth camp is now operated by Norman H. Guth, Inc., and the permit for the Smith Gulch site was issued to Gail and Stan Watt. Jt.Stmt. ¶ 41; (AR 112).

### 2. The Arctic Creek Camp

The Arctic Creek Camp is located at River Mile 66 and consists of two buildings totaling 1,020 square feet. FEIS, I, p. 2. It has running water, gas lights, and an outdoor pit toilet. The administrative record is incomplete as to the history of this camp because it was not added to the lawsuit until after the FEIS was completed. In brief, as we have noted, it was initially established by Don Smith as a base for a sightseeing operation after he sold the Big Squaw Creek camp to Guth. Over the years, Smith apparently constructed structures, although the permits authorize only temporary structures. The 1978 Permit lists "none" under improvements; the 1979 had no notation at all under the listing of improvements. Pl. Stmt. ¶ 23. The 1990 permit contained a special clause providing that:

Nothing in that permit shall be construed to imply permission to build or maintain any structure not specifically named on the face of this permit, or approved by the authorized officer in the form of a new permit or permit amendment.

Pl.Stmt. ¶ 25.

### 3. The Stub Creek Camp

The Stub Creek camp is located at River Mile 50. It consists of three buildings, totaling 1,554 square feet holding up to 12 people. FEIS, I, p. 2. The facilities are "fairly rustic and mainly serve the needs of steelhead fishermen in the fall." FEIS, III, p. 22. It has running water and electric lights from a hydro-power generator. It has an outdoor, pit toilet facility.

The camp was first permitted in 1966. In 1973, a permit for a private camp was issued to Hank Miller. In recognition of the restrictions of the Primitive Area regulations prohibiting permanent structures, Miller and the USFS agreed that the permanent structures would be phased out. The 1973 permit required all improvements to be removed when Mr. Miller and his wife had no further use from them. Pl.Stmt. ¶ 27.

Miller sold his river outfitting business, but retained the Stub Creek camp. Miller's 1993 permit allowed the sale of the improvements and removed the previous clause requiring removal of the permanent structures. Pl.Stmt. ¶ 28.

C. *History of the Lawsuit*

Following rejection of its administrative appeal, Wilderness Watch filed suit on July 19, 1991, seeking review of the USFS decision to allow the relocation of the Guth camp to Smith Gulch, alleging violations of WSRA, NEPA, and the APA. Jt.Stmt. ¶ 1.

The parties, as previously discussed, reached a settlement. Jt.Stmt. ¶ 1. As part of the settlement, the USFS agreed to prepare an EIS to "re-examine the need for the outfitter camp to exist at Smith Gulch." FEIS, at I, 2. The USFS also decided to expand the scope of the EIS to both the Arctic Creek and Stub Creek camps, which were similar outfitter camps located near the Smith Gulch camp. *See id.* At this point, the court stayed this action pending further order, and denied a motion to intervene filed by Norman H. Guth without prejudice, allowing him to refile the motion upon the completion of the EIS. (CR 28, 31).

The USFS completed the EIS and issued a Record of Decision ("ROD") on June 5, 1995, and announced its decision to implement Alternative 2 of the EIS. Jt. Stmt. ¶¶ 2, 3. Alternative 2 to the FEIS, referred to as the "Minor Camp Modifications" alternative, requires only minor external modifications to each of the camps "to make the sites appear more primitive."[4] FEIS, Summary, 2. The current permits for the Smith Gulch, Arctic Creek, and Stub Creek camps issued on May 5, 1996, January 1, 1996, and February 7, 1996, respectively. Jt.Stmt. ¶¶ 4–14. Each has a term of 15 years, and requires an annually revised operating plan and modifications consistent with the EIS and ROD. Jt.Stmt. ¶¶ 4–14.

---

4. Alternative 1 is the "no-action" alternative, and would simply reissue special use permits to the camps; Alternative 3, the "Major Camp Modifications" alternative, would require major modifications to each of the camps; Alter- native 4 would require only temporary structures to accommodate guests at each of the sites; finally, Alternative 5 would limit use of the sites to day use only. FEIS, Summary, 2–3; Jt.Stmt. ¶ 2.

Wilderness Watch then filed an amended complaint challenging the FEIS and the presence of permanent structures at the camps. (CR 38). Wilderness Watch seeks (1) a declaratory judgment that the issuance of the permits was arbitrary and capricious, (2) an injunction against the USFS from issuing permits or otherwise approving the use and occupancy of the Smith Gulch, Arctic Creek and Stub Creek in their present form, (3) an order requiring defendants to remove all permanent structures on the sites and to restore the historical and culturally significant portions of the site surrounding the Briggs cabin, and (4) the preparation of an adequate EIS, as well as costs of litigation including reasonable fees.

## DISCUSSION

I. *Standard of review*

The USFS essentially argues that courts owe deference to administrative agency decisions and that application of that rule should foreclose judicial review in this case. However, because the critical issue in this case is one of statutory interpretation, the court must apply a different analysis before employing the traditional examination of the agency action under the APA's "arbitrary and capricious" standard of review.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), provides the proper analytical framework for court review of an administrative agency's construction of a statute it administers. *See id.* at 842–45, 104 S.Ct. 2778, as recently explained by the Supreme Court in *Food and Drug Administration v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). Under *Chevron,* a court must consider first "whether Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at

842, 104 S.Ct. 2778. "If Congress has done so, the inquiry is at an end; the court 'must give effect to the unambiguously expressed intent of Congress.'" *Brown & Williamson,* 120 S.Ct. at 1300 (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778).

■ In making that assessment, a court must look at the precise statutory section in question, but it must also analyze the provision in the context of the governing statute as a whole, presuming congressional intent to create a "symmetrical and coherent regulatory scheme." *Id.* at 1301 (quoting *Gustafson v. Alloyd Co.,* 513 U.S. 561, 569, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)). Finally, a court "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency," *Id.*

If, after conducting such an analysis, the court concludes that Congress has not addressed the issue, the court "must respect the agency's construction of the statute so long as it is permissible." *Id.* at 1300 (citing *INS v. Aguirre–Aguirre,* 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999)). In this case, the guidance of *Brown & Williamson* is especially important because understanding the history of river corridor regulation is vital to placing the present statute in the appropriate context.

Of course, the USFS's actions pursuant to NEPA and the WSRA are reviewed under the APA. *See Hells Canyon,* 227 F.3d at 1176–1177. Section 10(e) of the APA, 5 U.S.C. § 706(2)(A), governs the court's review of a final agency action under the WSRA and the NFMA. Under the APA, "[t]he reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706. The task of a court reviewing agency action under the APA's "arbitrary and capricious" standard, 5 U.S.C. § 706(2), is "to determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *see also Southwest Center for Biological Diversity v. USFS*, 100 F.3d 1443, 1448 (9th Cir.1996).

▰▰▰ The court may not substitute its judgment for that of an administrative agency. *See Hells Canyon*, 227 F.3d at 1176–1177. In the end, the court must defer to the administrative agency's action based on the presumption that the agency's decisions are valid. *See EPA v. National Crushed Stone Ass'n*, 449 U.S. 64, 83, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980). The court's review is generally limited to the administrative record that was before the USFS at the time that it made its decision. *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) ("[t]he task of the reviewing court is to apply the appropriate APA standard of review ... to the agency decision based on the record the agency presents to the reviewing court"); *Oregon Natural Resources Council v. Lowe*, 109 F.3d 521, 526 (9th Cir.1997). "However, in NEPA cases, the court may extend its review beyond the administrative record and permit the introduction of new evidence where the plaintiff alleges that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept stubborn problems or serious criticism ... under

the rug." *Lowe*, 109 F.3d at 526–27 (internal quotations and citation omitted).[5] The court may also, under circumstances, consider additional submissions from an agency to ascertain whether "an agency has rectified a NEPA violation after the onset of legal proceedings." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 2000 WL 1154279 (9th Cir. Aug.16, 2000).

## II. Wild and Scenic Rivers Act and the Central Idaho Wilderness Act

The pivotal issue on judicial review is whether permanent resort lodges are permitted under the WSRA and CIWA, particularly given the WSRA's mandate that "wild river areas" be administered so that they remain "essentially primitive." The USFS acknowledged this in its final decision on administrative review: "[t]he central issue in these appeals is whether the action under appeal is in compliance with the Central Idaho Wilderness Act...." (AR 1091).

Both parties agree that in enacting the CIWA, Congress acted to preserve the status quo in the Idaho and Salmon Breaks Primitive Area. In the preamble, Congress clearly stated that protection of the area "can be provided without conflicting with established uses." CIWA, § 2(a)(3). When the CIWA was enacted, permanent structures were prohibited in the Idaho and Salmon Breaks Primitive Area as a matter of law and regulation. *See* AR 1935; 36 C.F.R. § 293.17 (1999). As previously discussed, all permits issued in the area reflected this prohibition, including the Guth permit covering the Big Squaw Creek camp and the Smith permit covering the Arctic Creek camp. The fa-

---

**5.** Wilderness Watch has tendered additional affidavits with its summary judgment motion containing material outside the administrative record. Although the material in the affida- vits arguably falls into the category of information permitted under *Lowe*, the court will not consider it on summary judgment except to the extent it may be judicially noticed.

cilities at Stub Creek were expressly recognized, but scheduled for removal.

When CIWA passed, the only temporary outfitter-guide base camp facilities authorized in the relevant area were "rustic and limited to necessary facilities for the safe and sanitary conduct of the operation." (AR 1234).

In construing a statute, courts "presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts." *United States v. Hunter*, 101 F.3d 82, 85 (9th Cir.1996) (quoting *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–5, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988)). This includes knowledge of applicable administrative regulations. *See Marchese v. Shearson Hayden Stone, Inc.*, 822 F.2d 876, 878 (9th Cir.1987). One must presume that Congress understood that when it was referencing "existing uses," it was referencing existing *legal* uses. Permanent resort facilities were clearly not legal at that time.

When the CIWA is viewed in the context of the WRSA, which it must be under *Brown & Williamson* and under CIWA § 9(b), the statutory intent becomes even clearer. The CIWA designated the portion of the Salmon River at issue here— " '(ii) the seventy-nine-mile segment from Corn Creek to Long Tom Bar . . .' "—as a wild river. CIWA § 9(a). Under WSRA, the USFS must administer and manage these designated sections of the Salmon River "in such manner as to protect and enhance the values which caused it to be included" within the system "without . . . limiting other uses that do not substantially interfere with public use and enjoyment of these values. In such administration *primary emphasis* shall be given to protecting its *esthetic, scenic, historic, archeologic,* and *scientific* features." 16 U.S.C. § 1281(a) (emphasis added); *see also United States v. Hells Canyon Guide Service, Inc.*, 660 F.2d 735, 738 (9th Cir.1981). In

keeping with these goals, a "wild river area," such as the Salmon River corridor, should be "free of impoundments and generally inaccessible except by trail, with watersheds or shorelines *essentially primitive* and waters unpolluted." 16 U.S.C. § 1273(b)(1) (emphasis added). These rivers should "represent vestiges of primitive America." *Id.*

At the other end of the statutory spectrum are portions of the river designated as "recreational." These areas receive the least protection, allowing "some development." 16 U.S.C. § 1273(b)(3). When viewed on the continuum from "essentially primitive" to allowing "some development" at the other, the answer is clear: construction of permanent resort lodges in river corridors designated as "wild" is inconsistent with the WRSA. To hold otherwise would belie the presumption that Congress intended to create a "symmetrical and coherent regulatory scheme." *Brown & Williamson*, 120 S.Ct. at 1301. Because the statutory language, when viewed in historical context, is clear, "the inquiry is at an end; the court 'must give effect to the unambiguously expressed intent of Congress.' " *Id.* at 1300 (quoting *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778). Permanent lodges, particularly ones that are advertised for mini-business retreats, are not allowed in the "wild" Salmon River corridor.

Nonetheless, in the interest of completeness of analysis and in fairness to the agency, the USFS's arguments should be addressed directly. The USFS's primary contention is that the phrase "essentially primitive" is ambiguous, allowing the agency to supply its construction as long as it is reasonable. *See Chevron*, 467 U.S. at 844, 104 S.Ct. 2778. Given the statutory language, structure, and history, the court disagrees with this assessment. However, assuming *arguendo*, that the phrase is am-

1206

biguous, the court must examine the agency's construction to ascertain whether it is permissible. *See Brown & Williamson,* 120 S.Ct. at 1300. In making this determination, the court must read § 1273(b)(1) by reference to the WSRA as a whole. *See id.* at 1301. Moreover, the policies underlying § 1273(b)(1) should be construed in a manner that is consistent with the policies of other provisions of the WSRA. *See United Savings Ass'n v. Timbers of Inwood Forest Assocs. Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

The USFS raises essentially three arguments in support of its interpretation: (1) the lodges are a continuation of prior permitted uses; (2) the area at issue falls into the USFS Recreational Opportunity Spectrum as "motorized primitive" which would allow for development and (3) the hunting lodges further the "recreational values" for which the Salmon River corridor was designated as "wild."

■ First, the notion that construction of permanent hunting lodges was a prior activity specifically endorsed by Congress is incorrect: there is no express provision concerning lodges in the CIWA. By contrast, existing jetboat use is specifically mentioned. *See* CIWA § 9(a). By application of the venerable doctrine of *expressio unius est exclusio alterius,* one must presume that by specifically referencing one existing use—and omitting reference of another—that Congress meant to exclude the omitted use. *See, e.g., Lares v. West One Bank (In re Lares),* 188 F.3d 1166, 1169 (9th Cir.1999). This is consistent with the statutory maxim that:

> exceptions from a general policy which a law embodies should be strictly construed; that is, should be so interpreted as not to destroy the remedial processes intended to be accomplished by the enactment.

*Spokane & Inland Empire Railroad Co. v. United States,* 241 U.S. 344, 350, 36 S.Ct.

668, 60 L.Ed. 1037 (1916). This rule applies with special force to grandfather clauses. *See Rutherford v. United States,* 616 F.2d 455, 457 (10th Cir.1980) ("Since we are dealing with a Grandfather Clause exception, we must construe it strictly against one who invokes it.") (quoting *United States v. Allan Drug Corp.,* 357 F.2d 713, 718 (10th Cir.1966)). Of course, here the USFS does not even have the strength of a grandfather clause upon which to rely. In addition, "permeat[ing]" the provisions of the WSRA is an emphasis on protection, which the court must give "a broad rather than a narrow perspective." *Hells Canyon Guide Service,* 660 F.2d at 737–38.

As previously discussed, the lodges are not a continuation of prior legal uses: permanent construction was forbidden in the primitive area. *Cf. McDonald v. Thompson,* 305 U.S. 263, 266, 59 S.Ct. 176, 83 L.Ed. 164 (1938) (noting in the context of the Motor Carrier Act that the grandfather clause did "not extend to one operating ... in defiance of ... laws."). The Smith Gulch Lodge did not exist when the CIWA was passed and both the Stubb Creek and Big Squaw Creek lodges were scheduled for removal for regulatory incompatibility.

In the legislative history, as the USFS points out, there is reference to "hunting camps": the House of Representatives Report noted that "[c]ertain activities generally permitted in wilderness areas, such as hunting camps on the river ... can continue within the wild and scenic river corridor on the river." H.Rep. No. 96–838, 96th Cong., 2d Sess. 15, 20 n. 2 (1980). Where statutory command is clear, "there is no reason to resort to legislative history." *City of Auburn v. United States,* 154 F.3d 1025, 1029 (9th Cir.1998) (quoting *United States v. Gonzales,* 520 U.S. 1, 1, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997)). However,

even if examined, legislative history does not support a contrary conclusion because "hunting camps" were—and are—of a different regulatory character than "resorts" and involved the use of temporary structures. Thus, the legislative history does not support a construction that permanent resort lodges with concrete footings could be placed in the corridor.

■ The second justification—that the corridor falls within the ambit of the category of "motorized primitive" in the USFS Recreational Opportunity Spectrum ("ROS")—is also unpersuasive. The USFS ROS, as the USFS has continuously emphasized in response to other arguments, is a management guide only; it does not have statutory force. Even if it did, the ROS itself does not support the USFS contention. There are five regulatory categories in the ROS: primitive, semi-primitive (non-motorized), semi-primitive (motorized), roaded natural, rural and urban. (AR 3896). The category of "semi-primitive (motorized)" includes the use of motorcycles, off-road automobiles, trains, buses, and aerial trams. These described uses do not comport with the Congress's definition of a "wild" river designation which is an area "generally inaccessible except by trail." 16 U.S.C. § 1273(b)(1). The USFS argues that the use of motorized boats is decisive. However, use of powered boats is permitted in both the "primitive (non-motorized)" and the "primitive (motorized)" ROS categories. (AR 3896). Further, the USFS specifically concedes in the FEIS that jetboats are permitted in two other wilderness areas in Idaho, even though "uncommon for a Wild River or wilderness setting." FEIS, III, p. 3. Thus, to the extent it is relevant, the

ROS does not support the USFS's position.

■ The third argument advanced by the USFS is that the hunting lodges further the "recreational values" for which the Salmon River corridor was designated as "wild." The general statement of purpose, which applies to the Act as a whole, provides that certain designated rivers which possess "outstandingly remarkable scenic, recreational, ... or other similar values" shall be "preserved in free-flowing condition" and "protected for the benefit and enjoyment of present and future generations." 16 U.S.C. § 1271. However, while the Act states that recreational values are one of the many goals to be preserved in general, the Act makes it a mandatory duty for the USFS to place primary emphasis on a river's "esthetic, scenic, historic, archeologic, and scientific features" in its management of the designated river area. 16 U.S.C. § 1281(a). Moreover, promoting the river's recreational values cannot detract from the WSRA's clear directive that wild river segment remain "essentially primitive" and a vestige of primitive America.

Thus, even if a *Brown & Williamson* analysis proceeded to the point of considering whether the agency's construction was reasonable, it could only lead to the conclusion that the agency's construction was impermissible.[6]

III. *National Forest Management Act*

The NFMA requires the USFS to develop and maintain a forest management plan for each unit of the National Forest System. *See* 16 U.S.C. § 1604(a); *see also Wilderness Society v. Thomas*, 188 F.3d 1130, 1132 (9th Cir.1999). The forest plans must provide for multiple uses of

---

**6.** References to the "agency" in this context means the final decision of the USFS, as it must under review of an agency decision.

The analysis of the Bitterroot National Forest staff has been entirely correct from the onset.

forests, including "coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e)(1). All permits and contracts for the use of the forests must be consistent with the forest plans. *See* 16 U.S.C. § 1604(i); *see also* 36 C.F.R. § 219.10(e) (1999) ("[T]he Forest Supervisor shall ensure that ... all outstanding and future permits, contracts, cooperative agreements, and other instruments for occupancy and use of affected lands are consistent with the [land management] plan."). "Pursuant to the NFMA, the Forest Service must demonstrate that [all outstanding and future permits] would be consistent with the land resource management plan of the entire forest." *Neighbors of Cuddy Mountain v. USFS*, 137 F.3d 1372, 1377 (9th Cir.1998).

Wilderness Watch asserts that the construction of the permanent facilities at Smith Gulch camp violates the Wild River Plan, which was incorporated into Salmon and Bitterroot forest plans. Specifically, Wilderness Watch maintains that under the Wild River Plan no new structures are permitted except for safety and sanitation, (AR 2270), and that the construction of the Smith Gulch structures violates this provision. In opposition, the USFS contends that the new structures were built to enhance safety and sanitation, and that the Smith Gulch camp was simply a "relocation" of an existing camp and, as such, are not "new" structures. Def.Opp. at 41.

The court need not consider the parties' arguments under NFMA, however, because in light of the court's holding with respect to the WSRA, a NFMA violation occurred as well. As the USFS points out, the Wild River Plan states as one of its management objectives that the USFS "[i]dentify visitor needs and resource capabilities and determine necessary development of sites and facilities consistent with the intent of the Wild and Scenic Rivers Act and the Central Idaho Wilderness Act." (AR 2264). As held above, the Smith Gulch, Arctic Creek and Stub Creek camps are not in accordance with the WSRA or CIWA.

## IV. *National Environmental Policy Act*

Wilderness Watch contends that the FEIS prepared by the USFS is inadequate because it failed to thoroughly recount the voluminous correspondence regarding the relocation of the Big Squaw camp to the Smith Gulch site.[7] However, Wilderness Watch does not make the argument that environmental concerns raised in the correspondence were omitted in the USFS's final EIS. Rather, it maintains only that the "background information" allows for a more complete understanding of the process that resulted in the allegedly illegal construction of permanent structures at Smith Gulch. Pl.Br. at 40.

The decisions of the USFS pursuant to NEPA are reviewed under the APA's arbitrary and capricious standard. *See Morongo Band of Mission Indians v. Federal Aviation Admin.*, 161 F.3d 569, 573 (9th Cir.1998) (quoting 5 U.S.C. § 706(2)(A)). Similarly, an agency's action concerning the issuance of supplemental environmental impact statements should not be set aside unless arbitrary and capricious. *See Friends of the Clearwater*, 222 F.3d 552. For actions challenging the adequacy of an EIS, the court must employ a "rule of reason" test to determine whether

---

7. After providing a general overview of the history of the Smith Gulch site, the USFS states: "The EIS does not evaluate the legality of the existing outfitter camps. Rather, the EIS considers alternative ways of managing the Stub Creek, Smith Gulch and Arctic Creek sites and evaluates the effects upon Wild and Scenic River values under each scenario." FEIS, 1, 4.

the EIS contains a " 'reasonably thorough discussion of the significant aspects of probable environmental consequences.' " *Hells Canyon*, 227 F.3d at 1177 (quoting *Neighbors of Cuddy Mountain*, 137 F.3d at 1376). Under this standard, the court must insure that the agency has taken a "hard look" at the environmental consequences. *Id.;* 40 C.F.R. § 1500.1(c) (fundamental purpose of NEPA is to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment.").

NEPA requires federal agencies to prepare "a detailed statement . . . on the environmental impact" of any proposed federal project "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i). This detailed statement "aids a reviewing court[,] . . . provides environmental information to the public[,] . . . and prevents stubborn problems or significant criticism from being shielded from internal and external scrutiny." *Sierra Club v. Marsh*, 976 F.2d 763, 770 (1st Cir.1992) (internal quotations and citation omitted). However, every possible impact on the environment need not be discussed; rather, only those impacts "that are 'likely' (or 'foreseeable' or 'reasonably foreseeable')" such that "a person of ordinary prudence would take it into account in reaching a decision" must be addressed. *See id.* at 767. Moreover, "even as to those effects sufficiently likely to occur to merit inclusion, the EIS need only 'furnish such information as appears to be reasonably necessary under the circumstances for evaluation of the project.' " *Id.* (quoting *Britt v. U.S. Army Corps of Engineers*, 769 F.2d 84, 91 (2d Cir.1985)).

■ At issue is whether a discussion of the historical legality of the sites is relevant to the evaluation required by NEPA. The FEIS provides a brief synopsis of the sites' histories prior to the preparation of the impact statement, but fails to confront whether the facilities constructed on those sites were in compliance with prior USFS permits. "Public disclosure is a central purpose of NEPA," and would generally counsel in favor of the inclusion of all relevant information. *See id.* at 770. However, Wilderness Watch fails to point to any specific NEPA provision or regulation requiring an EIS to discuss the successes or failures of the USFS permitting process prior to the completion of the FEIS. *See* 40 C.F.R. § 1500 *et seq.;* 40 C.F.R. § 1508.27 (1999). Moreover, any prior USFS permit violation alleged by Wilderness Watch concerns Guth's operation of the Big Squaw camp and has little bearing on the propriety of structures at the Smith Gulch site. In any event, while such information is relevant to a challenge to the presence of the structures under the prior permits, it adds little to the analysis required by NEPA "to assure that federal agencies are fully aware of the impact of their decisions on the environment." *Friends of the Earth v. Hintz*, 800 F.2d 822, 836 (9th Cir.1986). These specific NEPA claims are therefore without merit.

■ However, the FEIS proceeded under the incorrect assumption that the WSRA and the CIWA permitted construction of new permanent resort lodges in a Wild River corridor. Indeed, the FEIS specifically notes: "[t]he EIS does not evaluate the legality of the existing outfitter camps." FEIS, I, p. 4. Thus, the FEIS was fatally flawed from the outset. In short, within the constraints of an incorrect assumption, the FEIS complied with NEPA; to the extent that it proceeded from an incorrect assumption, the FEIS did not comply with NEPA.

## V. *Declaratory and Injunctive Relief*

In its first amended complaint, Wilderness Watch seeks declaratory and injunc-

tive relief ordering (1) that the issuance of the permits for the Guth, Arctic Creek and Stub Creek camps violates the WSRA, and (2) that the permanent structures at each camp be removed. FAC, at 19. In their cross-motions for summary judgment, however, neither the USFS nor Wilderness Watch address the propriety or scope of the injunctive relief sought by Wilderness Watch.

■ "Injunctive relief is an equitable remedy, requiring the court to engage in the traditional balance of harms analysis, even in the context of environmental litigation." *Forest Conservation Council v. USFS,* 66 F.3d 1489, 1496 (9th Cir.1995) (citing *Thomas v. Peterson,* 753 F.2d 754, 764 (9th Cir.1985)) ("absent 'unusual circumstances,' an injunction is the appropriate remedy for a violation of NEPA's procedural requirements"); *see also Amoco Prod. Co. v. Gambell,* 480 U.S. 531, 541, 544–45, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (noting that "unusual circumstances" weighing against injunctive relief include "those in which an injunction would interfere with a long-term contractual relationship") (citing *Forelaws on Board v. Johnson,* 743 F.2d 677 (9th Cir.1984)). However, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration." *Gambell,* 480 U.S. at 545, 107 S.Ct. 1396. Where environmental injury is "sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* Nonetheless, "an injunction is an equitable remedy [that] does not issue as of course" when a violation of an environmental statute occurs. *Id.* at 542, 107 S.Ct. 1396 (citing *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)).

Under *Forest Conservation Council,* once the district court finds that the USFS has violated the environmental laws, the injunction that Wilderness Watch seeks "will not automatically issue." *See* 66 F.3d at 1496; *Oregon Natural Desert Ass'n v. Green,* 953 F.Supp. 1133, 1143 (1997) (balancing harms to determine whether injunction should issue for NEPA and WSRA violation). Given this and the fact that the parties have not briefed the question, the court has two alternatives: presentation of additional evidence concerning the injunction or remand to the agency.

The supplemental information tendered by Wilderness Watch does not address the issue of remedy. The USFS has not suggested that it has taken any further agency action that might require supplementation of the record under *Friends of the Clearwater.* The parties have separately submitted statements of undisputed facts under the local rule and have filed a joint statement of undisputed facts by court invitation. There may be some gaps in the administrative record concerning the Arctic Creek and Stub Creek sites, but otherwise the record is sufficiently complete. At this juncture, no imminent environmental harm is alleged. Indeed, it is no small irony that the new Smith Gulch lodge is conceded to be generally more environmentally friendly than the old Big Squaw Creek camp. The issue, at least as presented to the court, is not one of environmental harm; rather, it is one of statutory compliance. Further, no evidence has been tendered concerning the difficulty— or ease—of remediation.

In view of this, and the fact that affected third parties have not been joined in this action, the court elects to remand this matter to the agency to fashion a remedy consistent with this opinion. The USFS has experience in remedying non-conforming uses and is in the best position to assess how to do so. Further, the affected third parties have acted in reliance upon the USFS's erroneous interpretation, al-

though they have been on notice of this litigation. There is no suggestion of bad faith on the part of the permittees anywhere in the record. To the contrary, there are many glowing references in the administrative record to the contribution of the Guth family to the healthy development of the Salmon River. In developing a remedy, the USFS must be mindful of the interests of these parties. Nonetheless, the law is clear: the construction of permanent resort lodges is not permitted in this Wild River corridor.

## CONCLUSION

For the foregoing reasons, the court:

(1) GRANTS summary judgment in favor of Wilderness Watch on its motion for summary judgment on its claim for declaratory relief;

(2) DENIES the cross-motion for summary judgment filed by the USFS;

(3) DENIES Wilderness Watch's motion for summary judgment on its claim for injunctive relief; and

(4) REMANDS this case to the USFS for proceedings consistent with this opinion.